COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Elder and Frank
Argued at Chesapeake, Virginia


JAMES E. GERMEK
                                             OPINION BY
v.   Record No. 0712-00-1            JUDGE LARRY G. ELDER
                                          NOVEMBER 28, 2000
MARSHA K. GERMEK


          FROM THE CIRCUIT COURT OF GLOUCESTER COUNTY
                  William H. Shaw, III, Judge

          Roy H. Lasris (Lasris & Vannan, P.C., on
          brief), for appellant.

          Breckenridge Ingles (Martin, Ingles & Ingles,
          Ltd., on brief), for appellee.


     James E. Germek (father) appeals from a decree ordering him

to continue to pay child support to Marsha K. Germek (mother) on

behalf of the parties' adult child (daughter).  Father contends

the trial court erroneously found that daughter was

(1) "severely and permanently disabled" and (2) "unable to live

independently and support herself," as required to permit the

continuation of support pursuant to Code § 20-124.2(C).[1]

Assuming without deciding that daughter had a severe and

permanent disability, we hold the evidence was insufficient to

---

[1] Code § 16.1-278.15 applies to juvenile and domestic
relations district courts, whereas Code § 20-124.2(C) applies to
courts of record.  Both statutes provide the identical test for
determining whether a continuation of support is appropriate.
For purposes of consistency, we refer to Code § 20-124.2(C)
throughout this opinion.

establish that disability rendered her unable to live independently and support herself. Therefore, we vacate the trial court's award.

## I. BACKGROUND

Daughter was born on September 1, 1980, with multiple physical abnormalities. Upon her parents' divorce in 1995, daughter continued to reside with mother. Pursuant to the final decree of divorce, father paid mother $375 per month for daughter's support until she graduated from high school in June 1999. Shortly prior to daughter's high school graduation, mother moved the court to order that father continue paying support for her on the ground that her ongoing physical problems and related medical expenses rendered her both severely and permanently disabled and unable to live on her own and support herself.

The evidence introduced at the hearing on the motion established that daughter had multiple surgeries for heart, bladder and bowel dysfunction after birth. At the time of the October 1999 hearing, she had only one kidney, defecated by means of a colostomy, and urinated by catheterizing an internal artificial bladder constructed of stomach tissue. About a year before the hearing, she underwent voluntary surgery which converted her external urine collection bag into the internal artificial bladder she was using at the time of the hearing.

Daughter avoids contact activities to protect her one kidney and the abdominal openings serving her colostomy and ostomy. Her only other restrictions arise from the fact that she might have to go to the bathroom more often than other people and for longer periods of time, has to attend periodic medical appointments, and experiences intermittent kidney infections. She experiences no chronic pain and has no mental limitations.

Daughter worked an average of ten hours per week as a cashier and sandwich maker at Wendy's for one month one summer during high school. She left her job at Wendy's to work as a cashier for Farm Fresh for three months during the school year, but she chose to resign for reasons unrelated to any of her medical ailments. At the time of the hearing, daughter was enrolled as a full-time student at Rappahannock Community College taking seventeen credit hours and working about seven hours per week for minimum wage in the college's computer lab. She was taking business courses and planned to transfer to a four-year institution after two years of community college. Dr. Restaino, daughter's pediatric nephrologist, said no medical reason prevents her from attending college full-time.

Dr. Restaino opined that daughter could not live independently because of the risk of kidney infection and renal failure, which could cause her to run a high fever and render her unable to summon help, just as, in Dr. Restaino's opinion, a

person with diabetes or severe asthma should not live alone. Dr. Restaino admitted she was not aware of a time when this had happened to daughter. She subsequently stated that her opinion that daughter could not live independently stemmed from the fact that "[s]he has a medical problem that probably is not wise to live alone."

Dr. Restaino conceded that the last time daughter experienced kidney failure was in 1989 and that the last time she was hospitalized for a kidney infection was 1996. Although daughter's overall kidney function was somewhat reduced due to her recurrent infections, Dr. Restaino testified that she would still be classified as having "normal renal function" when not suffering from an infection. Further, daughter's infections were episodic, and prior to her voluntary surgery in 1998, they had occurred as much as two years apart. Although daughter had had three infections in the year following her voluntary surgery, Dr. Restaino opined that the increase likely was due to daughter's surgery and could decrease as she and her doctors became more skilled at the methods she used to catheterize herself. She said that daughter could "go into renal failure [again] next month" but that it was impossible to predict when she would experience another infection and that she could also "go another four or five years without an additional episode." Even at the time of the hearing, the infections were "months apart."

Daughter said she could live independently under ordinary circumstances but that, when she is sick, she needs someone to take care of her because she experiences high fevers, convulsions, disorientation, vomiting, and blurred vision. Mother opined that daughter would not make any decisions in her best interest when she is sick "[i]f the decisions were [daughter's] to make," but daughter testified that she can usually tell when she is developing a kidney infection and that she tells her mother or grandmother and obtains medical attention.

Dr. Restaino opined that daughter could not support herself "at her current age" because she could not earn "enough income to support herself . . . and her need for insurance." She opined that daughter could not afford to live without insurance "[b]ecause her current costs would exceed whatever she could afford. Her potential need for her catheterizations, her doctor visits, her possibl[e] future surgeries." She also opined daughter could not afford to lose her insurance because her medical conditions would become pre-existing.

When asked if daughter was "likely, within a reasonable degree of medical certainty, to require any additional medical procedures in the future," Dr. Restaino said, "It's hard to tell what her future will hold." Dr. Restaino named various procedures which might become necessary and other procedures

which daughter might choose to undergo voluntarily, but she did not opine that any particular surgery would be necessary or indicate when it would be necessary.

Daughter sees a cardiologist once a year for routine monitoring and must take antibiotics to protect her heart before she undergoes routine dental work. She sees Dr. Restaino every six months for monitoring of her colostomy and ostomy. She also is under the care of an endocrinologist and takes medication for hypothyroidism. Daughter opined that she could not support herself "[b]ecause I can't go to college full-time and work full-time" and "because I'm supposed to go to doctors every six months. And if I lived independently, I will not have any insurance, therefore I would not go to the doctors because I would have no way to pay for it." At the time of the hearing, daughter had medical insurance coverage through both mother and father. It was unclear whether daughter would be eligible for lifetime benefits under father's policy if she lived independently or ceased to be a full-time student. The record contained no evidence of whether daughter could obtain health insurance coverage of her own and, if so, the cost of same.

Daughter had physician and hospital expenses totaling $2,374.58 during 1999 and prescription expenses which would have totaled $793.45 without insurance coverage, for a total of $3,168.03 through the date of the October 29, 1999 hearing. Some of these expenditures related to kidney infections daughter

experienced in May and August of 1999, although what portion related to these treatments is unclear.

During 1998, daughter incurred bills of $56,681.95 for medical treatment and prescriptions, but the bulk of these costs related to the voluntary surgery she underwent to internalize her urinary collection reservoir.  Minus these expenses, daughter's 1998 medical expenses totaled $4,274.03.  Again, the evidence indicates that the treatment daughter underwent in November 1998 was for one of her intermittent kidney infections, and the record does not make clear what portion of the expenses related to the infection.

During 1997, a year in which daughter underwent no necessary or voluntary surgeries and experienced no kidney infections, her routine medical monitoring and prescriptions totaled $1,226.18.

The trial court held that daughter was permanently and severely disabled and that her disabilities were likely to worsen with age.  It opined that her disabilities, coupled with her risk of recurrent renal failure and associated hospitalizations, likely need for additional surgery "[a]s she gets older," and "continuing need for numerous medications" make "[h]er need for medical insurance coverage . . . crucial."  It held she "likely should not live alone" due to the nature of her condition.  Finally, it concluded she was unable to support herself because, although she would be able to "earn gainful

employment," her income from full-time employment would be insufficient to meet her particular needs, which include "medical insurance to handle the financial burden caused by her disability." Based on these findings, the trial court ordered father to continue paying $375 per month to mother and noted that "continued support should lead to [daughter's eventual] emancipation."

## II. ANALYSIS

Pursuant to Code § 20-124.2(C), a court "may . . . order the continuation of support for any child over the age of eighteen who is (i) severely and permanently mentally or physically disabled, (ii) unable to live independently and support himself, and (iii) resides in the home of the parent seeking or receiving child support." In the trial court, the burden of proving entitlement to a continuation of such support rests on the party seeking the continuation. In reviewing on appeal a challenge to the sufficiency of the evidence to prove such an entitlement, "we consider the evidence in the light most favorable to the party prevailing in the trial court." Schoenwetter v. Schoenwetter, 8 Va. App. 601, 605, 383 S.E.2d 28, 30 (1980).

Appellant contests the sufficiency of the evidence to prove only the first two prongs of the statute. We have not previously construed Code § 20-124.2(C) or Code § 16.1-278.15, see Rinaldi v. Dumsick, 32 Va. App. 330, 333-35, 528 S.E.2d 134,

136-37 (2000) (holding evidence sufficient to support order of continuation under Code § 20-124.2(C) without construing precise meaning or limits of statutory language), and we turn to principles of statutory construction for guidance. We give the words of a statute "their common, ordinary and accepted meaning," absent an indication by the legislature to the contrary, Gen. Trading Corp. v. Motor Vehicle Dealer Bd., 28 Va. App. 264, 268, 503 S.E.2d 809, 811 (1998), and we avoid interpreting each word in a way that makes it repetitious of another, see W. Va. Educ. Ass'n v. Preston County Bd. of Educ., 297 S.E.2d 444, 447 (W. Va. 1982). The three subsections of the statute are joined by the conjunctive, "and," requiring proof of all elements, see, e.g., Ooten v. Faerber, 383 S.E.2d 774, 779 (W. Va. 1989), and we hold that an award of continuing support under the statute requires a finding that the statutory elements are causally linked, i.e., that the child's severe and permanent disability renders her unable to live independently and support herself, see Rinaldi, 32 Va. App. at 334-35, 528 S.E.2d at 136-37 (implicitly requiring causal connection and finding evidence supported its existence).

Neither party disputes that daughter has a physical disability,[2] and we assume without deciding that her various

[2] Father urges us to hold the term "disability" as used in subsection (i) is limited to a condition that affects one's ability to pursue gainful employment. However, because subsection (ii) of the statute incorporates the issue of a

physical abnormalities constitute a permanent and severe disability within the meaning of Code § 20-124.2(C). We turn next to whether daughter was "unable to live independently and support herself."

We hold first the trial court did not find that daughter is unable to live independently, a necessary component of the statute. The trial court found only that "[she] likely should not live alone because her condition requires a vigilance that the average person without her limitations does not require." (Emphasis added). Although it held "[h]er emancipation is not precluded solely for that reason," the statute requires a finding that the child is unable to live independently before a court may order the continuation of support. Therefore, the court's findings on this issue are insufficient to permit the continuation of support.

The evidence also would not support a finding that daughter is unable to live independently. Although mother and Dr. Restaino opined daughter should not live alone, Dr. Restaino also opined that a person with asthma or diabetes should not live alone. Dr. Restaino's reasoning was that some kidney

child's ability to support herself, rules of statutory construction provide that we should not also read such a requirement into the legislature's intended definition of disability under subsection (i). See W. Va. Educ. Ass'n, 297 S.E.2d at 447. Therefore, we consider the impact of daughter's disability on her ability to obtain gainful employment and to support herself only in our analysis of subsection (ii).

infections have a sudden onset and that daughter might quickly develop a high fever which could cause her to become delirious and prevent her from calling for help.  However, the record contains no evidence that daughter had experienced sudden deliriousness recently or ever, indicating instead that, during the previous several years, she had reacted appropriately when she experienced symptoms warning her of a kidney infection by calling a family member or obtaining medical help for herself.  Further, Dr. Restaino also said merely that daughter's medical problem "probably" made it "[un]wise" for her to live independently.  Therefore, the evidence would not support a finding that her disability prevented her from living independently.

This case stands in marked contrast to Rinaldi, in which the child had both physical and mental disabilities, including a borderline IQ and weekly seizures, which had increased in severity for no apparent reason.  32 Va. App. at 332-34, 528 S.E.2d at 135-37.  In Rinaldi, a career expert explained "the practical, vocational hardships imposed by the[] limitations in [the child's] basic skills" and opined that he was not "self-supporting" or "capable of living independently."  Id. at 334, 528 S.E.2d at 137.

We also hold the evidence is insufficient as a matter of law to support a finding that daughter's disability rendered her unable to support herself.  The evidence establishes that

daughter sees a cardiologist and endocrinologist annually for monitoring of her cardiac and thyroid function and routinely takes medication for her thyroid condition. She also sees her nephrologist, Dr. Restaino, every six months for routine monitoring. Although she suffers from kidney infections from time to time, she has not been hospitalized for a kidney infection since 1996, and all recent infections have been treated with antibiotics on an outpatient basis. After May 1996, daughter was infection-free for two years and had another infection only after she underwent elective surgery to internalize her urine collection system. Although daughter experienced three infections within a year following that surgery, Dr. Restaino opined that the increase was caused by this voluntary change and that her physicians hope to determine and eliminate the cause, thereby decreasing the frequency of her infections. Dr. Restaino agreed that it was impossible to predict when daughter would experience another infection and that she had "no indication that [daughter] won't go another four or five years without an additional episode." Dr. Restaino also was unable to opine that daughter would require additional surgery, saying "It's hard to tell what her future will hold" and describing future surgery merely as a "possib[ility]" rather than as a probability or certainty.

Therefore, expenses for daughter's routine medical monitoring were properly includable in the calculation of her

fixed medical expenses, but expenses for treatment of possible future kidney infections or surgery were not. Mother presented evidence of the total annual cost of daughter's medical care and prescriptions for 1995 through 1999. Much of this evidence, however, did not permit a determination of which expenses were necessitated by routine monitoring and medications and which resulted from treatment for her elective surgery or intermittent kidney infections, the rate of recurrence of which was speculative. In 1997, a year in which daughter underwent no necessary or voluntary surgeries and experienced no kidney infections, her routine medical monitoring and prescriptions totaled $1,226.18.

Key to the trial court's determination that daughter's disability rendered her unable to support herself was that she "requires medical insurance to handle the financial burden caused by her disability" and that "[h]er other resources are insufficient to meet these needs." Although the availability of health insurance may be a relevant factor in a court's determination of whether to award continuing support for a disabled child who has reached the age of majority, here the court focused almost exclusively on daughter's need for health insurance. However, under the facts of this case, the availability to daughter of medical insurance and the cost of same was relevant only insofar as it would reduce her outlay for medical expenses which were certain and not speculative, and the

record contained insufficient evidence from which the trial court could make such a determinaton.  At the time of the hearing, daughter had medical coverage through both mother and father, and it was unclear whether she would be eligible for continued benefits if she lived independently or ceased to be a full-time student.  The record also contained no evidence regarding whether daughter could obtain health insurance coverage of her own and, if so, the cost of same.  Finally, as discussed above, the evidence did not establish the amount of daughter's medical expenses which were certain and not speculative.  Thus, the court had insufficient evidence from which to find that daughter's disability rendered her unable to afford either the cost of her actual medical care and medications or the cost of insurance and the non-covered portion of her actual medical care and medications.

Further, the trial court found daughter was able to obtain "gainful employment," and the record supports such a finding. Although she was working in the college computer lab only seven hours per week at the time of the hearing, no evidence indicated she was physically unable to work full time, and she had prior experience working as a cashier and sandwich maker.  She chose to attend college full-time, and any inability to work more than seven hours per week arose from her decision to attend college rather than her physical disability.  Further, that daughter, at present, may qualify only for minimum wage employment results

from her age and corresponding lack of education rather than from her permanent disability. Therefore, no evidence established that the routine medical expenses resulting from daughter's disability would have rendered an otherwise financially independent person unable to support herself. Thus, the evidence was insufficient to support a finding that any inability of daughter to support herself was causally related to her disability as required by Code § 20-124.2(C).[3]

For these reasons, we hold the trial court's award of continuing support was unsupported by the evidence, and we vacate the award.

<u>Vacated.</u>

---

[3] We make no decision regarding whether mother might obtain a future order for continued support under Code § 20-124.2(C) if daughter's condition worsens or whether father might have a future obligation to support her under Code §§ 20-61, 20-71, 20-72, 20-79 and related statutes.